In re Aleta D. CHELLINO, Debtor.

In re Dawn M. WETHERINGTON, Debtor.

In re Tracy L. BRADLEY, Debtor.

In re LeRoy M. SENESAC and Judith A. Senesac, Debtor.

In re Paul G. MATEER and Bonna L. Mateer, Debtor.

In re Everett E. HOESMAN and Laura L. Hoesman, Debtor.

In re Sandra C. EVANS, Debtor.

In re Melinda F. PENNEY, Debtor.

In re Robert C. MAILHOT and Dorothy M. Mailhot, Debtor.

In re Gerald R. PARKS and Susan A. Parks, Debtor.

In re Jerry R. WISNEWSKI and Linda L. Wisnewski, Debtor.

In re Pamela A. ALRANDI, Debtor.

Nos. 96–90941, 96–91203, 96–91204, 96–91207, 96–91208, 96–91210, 96–91439, 96–91440, 96–91441, 96–91442, 96–91443, and 96–91444.

United States Bankruptcy Court, C.D. Illinois.

Dec. 27, 1996.

Peter Frances Geraci, Chicago, Il. for Debtors.

## OPINION

GERALD D. FINES, Bankruptcy Judge.

These matters are before the Court on a Motion to Review Compensation of Debtor's Attorney Pursuant to Section 329 filed by the Case Trustee in *In re Chellino,* Case No. 96–90941, and upon a Motion to Show Cause filed by the U.S. Trustee in the other eleven cases captioned above. For the purpose of this Opinion, these cases have been consolidated in that the issue before the Court is the same in each case as are the interested parties.

The issue before the Court is whether the fees charged by Debtors' Counsel, Peter F. Geraci, in each of the above-captioned cases, exceeds the reasonable value of the services actually performed such that Debtor's Counsel should be required to return a portion of said fees to Debtors or their respective bankruptcy estates.[1]

---

1. Debtors' Counsel admits in his Response to the United States Trustee's Motion to Show Cause that this issue is governed by 11 U.S.C. § 329.

The controversy presently before the Court originated with the filing of a Motion by the Case Trustee in *In re Chellino,* Case No. 96–90941, on August 20, 1996, wherein the Case Trustee requested this Court to review fees charged by Debtors' Counsel to determine if they were excessive.[2] The Trustee's Motion in Chellino was set for hearing on September 5, 1996, and, on that date, Case Trustee, John Maloney, appeared on his own behalf and attorney Steven Diamond appeared on behalf of Mr. Geraci's law firm and Sabrina Petesch appeared on behalf of the U.S. Trustee. Arguments of the parties were heard on September 5, 1996, in *Chellino,* and the Court was advised by the U.S. Trustee's Office that it had just filed eleven Motions to Show Cause raising the same issue before the Court in Chellino in eleven other cases where debtors were also represented by the law firm of Peter F. Geraci. The Court determined that all twelve matters, including *Chellino,* should be heard together and, therefore, issued an identical Order in all twelve cases, on September 13, 1996, wherein Debtors' Counsel was ordered to:

[S]ubmit a detailed, written fee itemization setting forth the services for which counsel requests compensation, and specifically detailing time spent in Court for and on behalf of the Debtor(s).

The September 13, 1996, Order set November 8, 1996, as a deadline for the filing of the fee itemization with a further hearing being scheduled on the matter for November 14, 1996.

### I. Applicant's Response

On September 23, 1996, in *Chellino,* and September 25, 1996, in the other eleven cases, Debtors' Counsel filed identical pleadings entitled "Debtors' Attorneys' Response to Motion of United States Trustee's Motion to Show Cause" and "Affidavit in Support of Response to Trustee's Motion to Show Cause Regarding Fees."[3] 3 The main thrust of the Response filed by Debtors' Counsel was that the fees considered reasonable today by Mr. Maloney, the Case Trustee, and the U.S. Trustee may have been reasonable in 1974, but they aren't reasonable now. Debtors' Counsel further stated that:

Completing a time itemization to prove the reasonableness of the fee charged is not indicated or authorized and would have no bearing on the reasonableness requirement.[4]

Debtors' Counsel concluded his Response by praying for an order:

[F]or a Rule to Show Cause why the United States Trustee, M. Scott Michel, and Sabrina Petesch, attorney for the U.S. Trustee should not be held in contempt of Court for attempting to fix prices for consumer bankruptcy, and foster unfair competition, and for Rule 11 sanctions.[5]

Evidently, Debtors' Counsel did not feel fully vindicated by his assertions and allegations filed in his Response, on September 23 and 25, 1996, in light of his additional remarks included in the Affidavit attached to the Response. In an effort to convince the Court that the fees at issue are justified and reasonable, Debtors' Counsel makes nineteen numbered statements, some of which merit a brief discussion here.

In paragraph No. 1 of the Affidavit, Mr. Geraci states: "My law firm is chosen by more debtors than any other law firm in the world, to represent them in consumer bankruptcy cases." The Court notes that it has no way of knowing whether this representation is based in fact or not, but it is able to

---

2. In the 12 cases before the Court, Debtors' Counsel has disclosed that fees were charged ranging from a low of $1,053 in *Wisnewski,* Case No. 96–91443, to a high of $2,052.16 in *Mateer,* Case No. 96–91208.

3. The only pleading which Debtors' Counsel was directed to file at that time was a fee itemization for each case. The pleadings filed by Debtors' Counsel on September 23 and 25 do not support or substantiate the fees charged in these cases,

but some of the matters raised therein do merit brief discussion.

4. This assertion is contrary to established case law and the clear language of the Bankruptcy Code found in 11 U.S.C. §§ 329 and 330.

5. This request by Debtors' Counsel totally lacks any basis in either fact or law, nor is it relevant in any way to the issue presently before the Court.

conclude that, regardless of the veracity of the statement, it does not serve to support or substantiate the fees requested by Debtors' Counsel.

At paragraph No. 4 of the Affidavit, Mr. Geraci states:

The fee charged in this case is no more than I have routinely charged in thousands of cases in the last 4 years, and is based on a flat fee for services through discharge in the case. The trustee's attempt to trivialize this case shows no understanding of consumer bankruptcy law and is contemptuous of the Court.

As for the first sentence of this statement, the Court can only review the quality of the legal work in the cases before it. The comment about the Trustee's lack of understanding of consumer bankruptcy law and that the U.S. Trustee should be held in contempt of Court is without any merit or support. In over nine years, this Court has had the opportunity to view the work of Trustee Maloney and various attorneys from the U.S. Trustee's Office in hundreds of cases, and their work has always been knowledgeable and competent, as it has been in the cases presently before the Court.

In paragraph No. 5 of his Affidavit, Mr. Geraci seeks to justify his fees by comparing them to filing fees, with the conclusion that, had his fees kept pace with the increases in filing fees, he would be charging $2,400 to $4,800 in "simple" cases. The comparison suggested by Mr. Geraci is illogical and wholly irrelevant to the issue at bar. Mr. Geraci attempts a similar comparison in paragraph No. 6 between his fees and trustees' fees, which is no more logical or relevant than a comparison of attorney fees and filing fees.

At paragraph No. 7, Mr. Geraci touts that he is "the unquestioned foremost consumer bankruptcy practitioner in the country." Mr. Geraci further says that:

I do not and have never billed my clients on an hourly basis. I consider hourly billing to be fraudulent in most cases and apparently the Bankruptcy Code as well as

11 U.S.C. § 701 does not recognize "The Lodestar Analysis" as the correct measure in determining reasonableness of fees.[6]

Here again, the Court has been given no basis other than Mr. Geraci's word that he is the "unquestioned foremost consumer bankruptcy practitioner in the country," but that status is not exemplified by the work product of his law firm in the cases now before the Court and on the particular issue at bar. As for Mr. Geraci's statements about hourly billing and the use of the "Lodestar Analysis," the Court would only comment that hourly billing is clearly a widely used and accepted method of billing, and this Court is aware of no decision finding that hourly billing, in and of itself, is in any way inherently fraudulent. The Court would state further that, while it agrees that use of a "Lodestar Analysis" alone is not a proper method to determine reasonableness of fees, it is an appropriate factor to consider together with many others.[7]

At paragraph No. 10 of his Affidavit, Mr. Geraci accuses this Court of artificially maintaining fees for consumer bankruptcy cases "at an unreasonably low level by its $600 benchmark order in Danville, and an $800 order in Peoria." In addressing this statement, the Court must note that there are no such orders. The Courts in the Central District have a policy of reviewing fees in Chapter 7 cases when they exceed $600 to $800 in typical, straight-forward, no asset situations, and to require a written fee itemization for fees in excess of these amounts. There has never been an attempt to place a cap on fees in such Chapter 7 cases in the Central District of Illinois. The policy followed is merely in keeping with the mandate of 11 U.S.C. § 329. If a fee itemization supports the fee requested, this Court allows the fee even where fees exceed $600 to $800.

As he did in paragraph Nos. 5 and 6, Mr. Geraci again seeks to justify his fees by comparison to other costs of services and goods between Central Illinois and Chicago.

---

6. Despite his stated disbelief in hourly billing, Mr. Geraci did file fee itemizations in all twelve of the cases before the Court broken down by minutes at an hourly rate of $185.

7. *In re East Peoria Hotel Corp.,* 145 B.R. 956 (Bankr.C.D.Ill.1991).

In paragraph Nos. 11 and 12, Mr. Geraci states:

11. The only price in Central Illinois that is lower than anywhere else in Illinois is the cost of some housing. Cars are sold at the same or higher prices than in Chicago. Utility costs are the same. Long distance services are a dime a minute or higher. Food costs are virtually identical. It would be a shock to the professors at Southern Illinois University at Carbondale, Illinois State University, and the University of Illinois at Champaign to be ordered to cut their salary in half, because of the simple fact that they happen to be located in Central Illinois. The salaries for the excellent judges and their staff in the Bankruptcy Court and the U.S. District Court are identical to those in Chicago, and so is the filing fee, the interim trustees' compensation, and the salary of the U.S. Trustee and its attorneys and staff. I will charge less than I do in Chicago and Rockford and Northwest Indiana if they will. There is no basis for bankruptcy attorneys to be the only services in the Central District that are 1/3 to 1/4 of the cost of comparable services, when the cost of goods, and salaries, and everything else, is the same.

12. Rents for office space in downtown Peoria are actually *higher* than in downtown Chicago. I pay $16 per square foot for a Class B (Chicago standards) building suite with a lake view. In Peoria, comparable space, with none of the amenities, such as 24 hour doorman, security, and many other building services, is the same price. No view, no doorman, and the buildings in Peoria lock their doors at 5 P.M. Yet they charge the same price. Gasoline is the same price in Central Illinois, and in Peoria, a cheeseburger with fries across from the Courthouse is $7.95 at lunch, and the beer is $2.00.

These assertions are nothing more than "a frolic and a detour," and the Court sees neither the need nor requirement of addressing them further. Suffice it to say that Mr. Geraci is mistaken in his belief that this information is either helpful or relevant in establishing the reasonableness of his fees.

Perhaps the most curious and intriguing assertions made by Mr. Geraci appear at paragraph No. 13 of his Affidavit where he states:

The U.S. Trustee only allows lawyers who work for banks to participate in the program. A good example is John Maloney, an interim trustee, whose office in Normal is across the street from Busey Bank, his largest client. He refers his consumer bankruptcy leads to an attorney in Normal. Mr. Maloney has office space for rent on the second floor of his building for $500 per month, that would not rent for $100 per month in Chicago, if it were even rentable. The bank is allowed to choose its counsel, but debtors' attorneys must settle for the cheapest services rendered by attorneys who frankly cannot make a living doing bankruptcy work exclusively for debtors. My firm is not in that category, and my services and expertise cannot be compared to attorneys who have been forced to do work for artificially low prices by arbitrary Court orders and pressure from the U.S. Trustee. The banks, finance companies and trustees have a substantial interest in seeing debtors limited to ill-paid and ill-prepared counsel. That results in more asset cases for the trustees, and more favorable reaffirmations to banks, and more money paid to creditors as a result of bad advice to debtors. Debtors are entitled to strong, competent counsel and are perfectly willing to pay a reasonable fee for it. The debtor in this case is an intelligent, normal working class citizen, perfectly able to go to any lawyer other than this firm if the debtor desired to. Debtors are faced with a formidable array of creditors, who are sophisticated national operations who charge the same interest in Danville that they charge in New York City, and are faced with hostile interim trustees representing creditors, a hostile U.S. Trustee, and hostile, well-paid creditor representatives and creditor attorneys. To say that debtors are fair game in this district, and cannot select their own counsel, and must be prohibited from retaining my firm at reasonable rates which are still below those of comparable services and

creditor attorneys and trustee fees, is wrong.

To characterize these statements as "strange" would be an understatement. This Court has never seen use of such bald, baseless assertions in an affidavit to support any position, let alone to support the reasonableness of one's fees. This Court is aware of no evidence that would support any of these assertions, and the Court has never detected a hint of what Mr. Geraci alleges in any of the thousands of cases it has reviewed since August 1987, nor would it condone such. Furthermore, the Court fails to see the relevance of any of what is averred in paragraph No. 13.

As he did in paragraph No. 13, Mr. Geraci appears to go on the offensive against the U.S. Trustee and local practitioners in paragraph No. 15, where he states:

The U.S. Trustee is well aware of the practice of certain attorneys in consumer bankruptcy cases to file cases in court with "no money down". In other words, the consumer pays nothing pre-petition, and some attorneys even lend them the filing fee. The attorney has them sign a contract with penalties and collection costs clauses, and a wage assignment, or even post dated checks. This is done for anti-competitive reasons. Then, the attorney collects, post-petition, on his pre-petition contract. This is in directly violation of the Code, and trustees across the country have brought actions to stop this practice. However, the United States Trustee here has done absolutely nothing about it, even though I have complained to his attorneys several times. He favors those firms, and likes to oppress any debtor attorneys who seek to regularly practice in this area. The Court should *sua sponte* issue an Order in that matter if it is interest (sic) in protecting debtors. "No money down" practitioners can drive others out of the practice or drive their fees down in an anti-competitive manner. I have watched "fee-wars" in the bankruptcy area, and when the fee gets down to $200 or so, the next jump is to "no money down", to conceal the true fee. After that, the next method of driving out competition is "we advance the filing fee". Therefore, price rather than quality becomes the selling point. I charge a fair price for my services, I disclose it up front, and I compete based on a high level of quality, service and reliability. It is unfair of the trustee and this Court to try to put me out of practice by driving my fees down while favoring occasional practitioners and attorneys that should be disbarred for collection of fees post petition based on pre-petition contracts. Why do the Court and the trustee not move to have those illegally collected fees disgorged? Perhaps the District Court and the 7th Circuit can accomplish this.

As for paragraph No. 15, the Court will only comment here that none of these assertions are supported by fact, nor are they relevant to the issue presently before the Court.

In paragraph No. 16 of his Affidavit, Mr. Geraci states that:

Fees mentioned by the Trustee of $450 to $700 are for attorneys who do not regularly practice bankruptcy law, but do general practice, and in my opinion, are so low as to encourage fraud and neglect.

This statement is not accurate. Nearly 10,000 cases will be filed in this District in 1996. There are numerous attorneys in the Central District of Illinois who would be considered regular bankruptcy practitioners who routinely charge between $450 and $700 for the exact same type of cases that are presently before the Court. Mr. Geraci may believe that fees in this range encourage fraud and neglect, but this Court has not seen evidence of this in any of the thousands of cases it has reviewed.

At paragraph No. 17 of his Affidavit, Mr. Geraci states:

There will always be some attorney who charges less than another. That is the case in Chicago also. Some attorneys here charge $400. I do not represent people for $400. The trustee's attitude is that all bankruptcies are alike, and all consumers should have $400 attorneys. The trustee has obviously never practiced law in a private setting. If the trustee is correct in his reasoning in Central Illinois, it can be applied anywhere in this country, and the

result will be to sink the fees in consumer bankruptcy to the level of the lowest. What has happened in Chicago historically is that the lower priced practitioners have either left the practice of law, or been suspended or disbarred.

The only comment the Court would make here is to say that Mr. Geraci has obviously misconstrued the argument of the U.S. Trustee. The U.S. Trustee has never represented or argued that all bankruptcies are alike, nor has it ever been argued that all consumers should have "$400 attorneys."[8] In fact, the U.S. Trustee clearly recognizes that some attorneys do, in fact, charge $700 in fees to represent debtors in cases substantially similar to the cases at bar.

Mr. Geraci concludes his Affidavit, at paragraph Nos. 18 and 19, wherein he states:

18. No judge or the trustee has been interested in the problem of over-compensation of the Trustee or interim trustees. Chapter 13 trustee fees are at the maximum statutory level, and have never been reduced in this District in the last 10 years, even though rising caseloads and higher payments should accomplish some efficiency. Interim Trustees are routinely handed $6,000.00 to merely accept the proceeds of a personal injury case grossing $40 or $50,000.00, where all of the work has been done by the personal injury attorney. It is obvious that the trustee is interested in protecting those creditor lawyers, while keeping debtor lawyers off the trustee panel, and attacking consumer specialists. The interim trustee is also allowed to double dip by hiring his or her friends as the attorney for the trustee, and courts routinely approves (sic) their "hourly" rate at $150 to $200 per hour.

19. Consumer bankruptcy attorneys representing creditors routinely tack on $200.00 or more to send out a form reaffirmation. There is not more than an hour of work in that. Often, there is no attorney involvement in it, is is (sic) a form that is filled in by a clerk, yet the person paying it, the debtor, is charged $200. The trust-

ee argues that compensation of $450 to $700 for 6 months or more of involvement, risk and responsibility is fair, yet rubber stamps the debtor's charges for work performed by creditor attorneys, which is tacked on to his car note or mortgage. They routinely charge $2000 for a foreclosure action, and routinely charge $200 to $400 for a form motion to modify a stay which is agreed. My charges should be $2000 if I charged at their rates, which are not excessive. To be attacked for charging rates that are half of what creditor attorneys charge for the same work is unfair.

To the extent that any of these statements could ever be supported by concrete evidence, the Court finds that they are not relevant to the issue at hand, nor do they, in any way, substantiate the fees sought in the twelve cases now before the Court.

*II. Applicant's Fee Itemizations*

On October 15 and 16, 1996, Debtors' Counsel filed written fee itemizations in each of the twelve cases before the Court together with an Addendum which purportedly supports the fees charged in each case. Although the Court has carefully examined each fee itemization separately, the discussion here will be limited to matters of general similarity in all of the itemizations.

■ ■ In evaluating attorney fee applications and itemizations the Court must consider the following areas:

(1) Are the services that are the subject of the application properly compensable as legal services?

(2) If so, were they necessary and is the performance of necessary tasks adequately documented?

(3) If so, how will they be valued? Were the necessary tasks performed within a reasonable amount of time and what is the reasonable value of that time?

*See: In re Wiedau's, Inc.,* 78 B.R. 904 (Bankr.S.D.Ill.1987), citing *In re Wildman,* 72 B.R. 700 (Bankr.N.D.Ill.1987). *In re*

---

8. No one could argue that all bankruptcies are alike, but anyone familiar with Chapter 7, no-asset cases would agree that there are many

significant elements that are the same from one case to another.

*East Peoria Hotel Corp.*, 145 B.R. 956 (Bankr.C.D.Ill.1991).

In order to support a fee application, a time itemization must list each activity, its date, the attorney who performed the work, a description of the nature and substance of the work performed, and the time spent on the work. *Wiedau, supra*, at 907. Time entries for telephone calls, conferences, and letters must state the purpose or nature of the service and the persons involved. *Id.* at 908. Each type of service must be listed separately with the corresponding specific time allotment. Services may not be lumped together. Additionally, time expended must be reasonable in light of the results obtained. In *re Mid–State Fertilizer Co.*, 83 B.R. 555 (Bankr.S.D.Ill.1988); and In *re Prairie Central Railway Co.*, 87 B.R. 952 (N.D.Ill.1988).

In evaluating the fee itemizations presently before the Court, the Court must note that none of them fully comply with the standards set out above. Many of the time entries do not sufficiently describe the service being performed. Time entries such as "Creditor called, Household Bank" are not sufficient to support compensation for the time purportedly spent on that service. Many of the services are lumped together such that the Court is unable to determine the amount of time spent on each individual service.[9] Time entries falling into either of these two categories cannot form the basis for the compensation requested. The fee itemizations further show time billed at $75 per hour for "Clerk" time. The U.S. Trustee has objected to this time as uncompensable. Mr. Geraci accurately points out that Courts in this District have allowed billing of paralegal time at $75 per hour; however, the time itemizations do not indicate that paralegals actually performed the services at issue. Based upon the information found in the itemizations, the Court must consider "Clerk" time as uncompensable billing of overhead, which is forbidden in the Bankruptcy Code and supporting case law.

From its review of the twelve cases at bar, the Court concludes that, while these cases involve different debtors, different creditors, and other subtle differences, these cases are essentially the same type of case. These cases are all simple, no asset Chapter 7 cases that involved very little time in Court.[10] Only one of the cases had a priority creditor, and all of the cases had relatively few total creditors. No motions to avoid liens were filed in any of these cases, and there were only two cases in which there were motions filed relating to anything other than the issue at hand. Some reaffirmations were filed in these cases, but the number filed in each case was relatively normal. In all but one case, the number of reaffirmations actually filed was less than the number that Debtors stated they intended to file. In all but one of the cases, the only other Court appearance by Debtors' Counsel, besides the § 341 hearing, was on the fee matters at bar.[11]

Having set out the numerous similarities in the twelve cases at issue, the Court will further note that the fee itemizations are also similar in that none of the fee itemizations add up to the amount actually charged by Debtors' Counsel as disclosed on the Rule 2016(b) Statement filed in each case.[12] The Court also notes that attached to each itemization is an Addendum that is identical in every case.

### III. Applicant's Addendum to Time Itemization

In addition to a time itemization, most Courts require a narrative be filed which more fully describes a given case by setting

---

9. The itemizations supplied by Debtors' Counsel indicate that Counsel is either unable or unwilling to supply detailed information from which the Court can properly evaluate the services performed.

10. *In re Chellino* was filed as a no asset Chapter 7; however, the Trustee concluded after the § 341 hearing that the Debtor had one asset that needed to be liquidated for the benefit of her creditors.

11. In *Chellino*, Debtor's Counsel hired local counsel to attend the § 341 hearing. As such, Counsel's only Court appearance in *Chellino* involved the fee matter presently before the Court.

12. Nine of the twelve itemizations show less fees than actually charged, while three of the twelve itemize a bit more than was actually charged.

out the issues to be dealt with, the goals sought to be achieved, and the plan for achieving those goals. In keeping with this requirement, Debtors' Counsel has attached a document entitled "Addendum to the Itemization." This Addendum is identical in each case and states what services Debtors' Counsel would render in a hypothetical Chapter 7 case, rather than the services actually performed in each case before the Court. As such, this Addendum is not relevant to any particular case, nor supportive of the fees charged in a particular case.

As in his Affidavit attached to his Response to the U.S. Trustee's Motion to Show Cause, Mr. Geraci makes numerous assertions in his Addendum that merit brief comment by the Court. On the first page of the Addendum, Mr. Geraci states:

> We are not a solo practitioners (sic) who, with all due respect to fellow attorneys, may be without malpractice insurance or assets, who maintains inadequate staff and offices, who does not answer the phone, relying instead on an answering machine or a secretary, and who may not be reporting his or her income correctly. The IRS has identified solo practitioners as a group who cheat on their taxes. Taking shortcuts, not running a first class office in accordance with accepted business practices, not being able to back up their advice with adequate resources, and being able to accept less money because other fees, such as traffic and divorce, are not accurately reported as income, may be a large part of our "competition" that the trustee claims charge less.

These unsupported allegations against solo practitioners are not relevant to the issue at bar nor do they in any way serve as a justification for the fees charged in the subject cases. Mr. Geraci goes on to state:

> We never represent creditors, have no ethical conflicts in that regard, and are aggressively and without reservation true representatives of our client, not apt to sign off on documents because of hidden interests and relationships common to small town practice.

This statement was shown to be inaccurate at hearing on November 14, 1996, in evidence which Trustee Maloney supplied showing that, at one point in time, his law firm contracted with Mr. Geraci to have Mr. Geraci perform certain creditor collection work. This arrangement did not work out and has since been terminated, but the fact remains that Mr. Geraci cannot accurately assert that he has never represented creditors. This statement is irrelevant in addition to its inaccuracy.

At the second page of the Addendum, Mr. Geraci avers that:

> The treatment of debtors in this District, by the Trustee and the interim trustees and the creditors, is terrible. In Peoria, for instance, debtors are interrogated as if before a grand jury, in front of all the other debtors, who are all scheduled to be there at the same time. They are called before a trustee who sits at the front of the room in the same position as a judge, made to sit in a chair at the front of the room and their attorneys are not permitted to sit next to them because "that is not customary." Their sad story is played out as at an inquisition, with creditors questioning them from across the room. The meeting room is small and cramped yet The U.S. Trustee has rented in the most expensive granite clad building in Peoria. The U.S. Trustee's space is large, but the debtors are shoved into a small hearing room with no semblance of dignity.

Even though Mr. Geraci is entitled to his opinion about the treatment of debtors in this District, that opinion is not relevant to the inquiry before the Court, and such an opinion is not something called for in a narrative filed in support of a fee application.

Mr. Geraci continues by stating:

> There is no bankruptcy bar for the debtors in Peoria, just occasional practitioners, or small volume, solo practitioners who have 4 line ads in the Peoria Journal Star advertising any case for $400, just like they are selling cans of soup. The local Creditors and banks who make political contributions to the U.S. Trustee's relatives are the same banks and creditors that are behind this attempt to run us out of town. They like things cozy, with a

weak debtor bar, and the (sic) do not like the public having access to information about bankruptcy relief, from our firm, or access to quality legal representation.

This assertion, like many others made by Mr. Geraci, is not relevant to the subject issue, nor is it in any way supported by fact.

Mr. Geraci also indicates, at the second page of his Addendum, that:

It is interesting that although Champaign is the major city in the central eastern part of the State, politics have kept any 341 meetings from being held in that location. Politics, as well as other forces, have set the 341 meetings all over the Central part of the State, in a crazy quilt patchwork of locations that looks like Bob Dole's recent campaign schedule in Illinois. Instead of setting 341 meetings in all 5 major cities, all easily accessible by expressway, they are set in many locations, which favors the small solo or the general practitioner, who does not service a wide geographic area. The nature of the Court call, and the natural geography of Illinois, has prevented any firm of any size from making a living representing debtors. Not surprising, the creditor attorneys in Central Illinois seem to be doing very well. This attack by the Trustee is just a transparent attempt to keep debtors from having representation of their choice, and information about bankruptcy, so debtors are kept in their miserable condition as much as possible.

Not only is this assertion irrelevant, but it is not supported in fact. The many different locations for § 341 meetings in the Central District were established for the benefit of *all parties* and had been established even before the U.S. Trustee Program came into existence. There is absolutely no basis to support Mr. Geraci's assertion that the establishment of various § 341 meeting locations was done to somehow favor the creditors and the Trustees over the debtors. This Court is keenly aware of its duty to protect the interests of all parties to a bankruptcy proceeding, and it carries out that duty to the fullest extent in every case before it.

In his Addendum, Mr. Geraci indicates a major part of his service includes "Pre-Screening for Problems." Mr. Geraci states:

Our clients receive intensive screening to determine assets, preferences, transfers, potential adversaries and other potential difficulties. Many of these issues fall within the attorney-client relationship and are inappropriate to discuss in individual fee applications such as the Court has ordered. There is substantial value to the client to pre-screen cases. It lessens the likelihood of unanticipated problems which can cause even more turmoil for a family already laboring under the strain of burdensome debt. Inadequate inquiry into value of the home and personalty and their applicable exemptions can leave a family scrambling to buy out the Interim Trustee's interest in a homestead, car or furniture. This chaos is the sort of thing debtors seek to avoid when they apply for relief under the bankruptcy code. Our thoroughness allows them to avoid that uncertainty and unpleasantness. Our client may possess an asset but he or she is completely apprised of this fact and of what awaits them at their 341 examination prior to that examination. Of course, from the trustees' point of view, this is bad for them, because they will rarely, if ever, see an asset Chapter 7 from this office. Of course they will complain and try to destroy our practice, so that the occasional $600 practitioner can fumble asset cases into their laps. The other team does not want good coaching, or well paid players, to show up at game time.

The instant fee itemizations do not reveal the "intensive screening" Mr. Geraci refers to. In fact, in *Chellino*, which was filed as a "no-asset" case, the Trustee has discovered an asset which must be liquidated for the benefit of the creditors. As stated above, none of the cases presently before the Court involve complicated issues of preference, transfers, potential adversaries, or for that matter any other potential difficulties. If such problems were, in fact, present in these cases prior to filing, the fee itemizations do not support a finding that there was "pre-screening" work which resolved such problems. The records of the twelve cases being considered in this

Opinion do not reveal adversary proceedings and the time itemizations don't reveal any specific instances where time was spent preventing the filing of adversaries. In fact, the fee itemizations before the Court disclose only minimal personal contact with the Debtors. The Court finds it unlikely that any extensive pre-screening or pre-planning could be done in one initial interview with the Debtors lasting between 36 and 48 minutes.

Although the Court finds that much of the information contained in the Addendum is either irrelevant or unsupported in fact, the Court recognizes that some of the information is supportive of the services rendered by Debtors' Counsel. Most of the areas where Counsel's service is supported, however, are areas of service that all attorneys should and do render routinely. There is nothing in the Addendum to convince the Court that Mr. Geraci's firm has provided extraordinary services in any of the twelve cases under consideration.

In addition to the Addendum discussed above, Mr. Geraci has attached the following form affidavit (or a substantially similar form) to his fee itemizations. These affidavits are purportedly signed by various debtors that Mr. Geraci has or is presently representing in bankruptcy proceedings.

### AFFIDAVIT IN SUPPORT OF DEBTOR'S ATTORNEY'S FEES

The undersigned hereby certifies under penalty of perjury:

1. I am _____ years old, have _____ years of education and my occupation is _____, and I consider myself competent to hire an attorney.

2. I have selected the law firm of Peter Francis Geraci as my bankruptcy attorney after careful consideration, and I am aware that I could have hired a number of other attorneys, and I agree to pay the fee of $ _____ plus a money order for $175 payable to Clerk of U.S. Bankruptcy Court even though my attorney has told me I can find a cheaper attorney.

3. I understand that most attorneys who do this kind of work regularly work for the bill collectors, banks and creditors, and so does the U.S. Trustee who will examine my petition.

4. I understand that I could have hired a different attorney who may have charged me less in fees, such as $600 or $800, but I feel that you get what you pay for, and although the U.S. Trustee and some Bankruptcy Judges want to hold the attorneys fees of debtors' attorneys at 1975 levels, I feel that this results in driving smart lawyers out of the debtor bankruptcy field and I am choosing the law firm of Peter Francis Geraci after careful consideration.

5. I can afford to pay my attorneys fees and do not want the Court or Trustee interfering with my ability to hire a competent attorney of my own choosing.

_____ Debtor DATED: _____

None of the affidavits attached to the fee itemizations at issue is signed by debtors in the affected cases. The wording on the affidavits is obviously the wording of Debtors' Counsel and not of the debtors who purportedly signed the affidavits. These affidavits are thus clearly self-serving and without much relevance. The Court finds paragraphs 3 and 4 particularly unusual in that these statements are clearly outside of the normal scope of knowledge that a normal debtor would have, thus rendering the entirety of the affidavits suspect.

### IV. Procedural Issues

Before making its conclusions of law, the Court finds it necessary to address certain procedural issues raised by Debtors' Counsel at hearing on November 14, 1996, and again in two Motions filed on November 25, 1996, in each case before the Court, entitled "Motion to Strike Attorney Affidavits Contained in Memorandum in Support of Motion to Show Cause and Reply to Response" and "Motion to Enlarge Time in Which to Supplement Record Pursuant to Federal Bankruptcy Rule 9006." As the Court noted above, the issue of the reasonableness of the attorney fees for Debtors' Counsel was initially raised by a pleading filed by the Case Trustee in *Chellino* in August of this year. The hearing was scheduled on that Motion for

September 5, 1996, and an Order was entered on September 13, 1996, directing Debtors' Counsel to file fee itemizations in the twelve cases before the Court. A hearing was held on November 14, 1996, at which time the Court allowed the parties to introduce any material in addition to the written materials already before the Court. At hearing on November 14, 1996, Debtors' Counsel sought an extension of approximately 120 days for the purpose of taking depositions of certain local attorneys from whom the U.S. Trustee had elicited statements about the fees which they charged in routine no-asset Chapter 7 bankruptcy cases. The Court denied any extension of time as requested by Debtors' Counsel, but it did allow Debtors' Counsel 14 days in which to submit any further argument or evidence.

In support of her Memorandum in Support of Motion to Show Cause and Reply to Response, the attorney for the U.S. Trustee submitted certain transcripts and an audio tape of a Section 341 hearing in Kankakee, Illinois, where the attorney for the U.S. Trustee questioned certain debtors who were represented by Mr. Geraci's firm about their relationship with the firm and their feelings about the fees which they had been charged. Additionally, the U.S. Trustee questioned four "local attorneys" who regularly practice bankruptcy in the Kankakee area concerning the fees which they charge in routine no-asset Chapter 7 bankruptcy cases like those presently before the Court. In reviewing the oral argument of Debtors' Counsel at hearing on November 14, 1996, and the pleadings filed on November 25, 1996, it appears to the Court that Debtors' Counsel is only seeking additional time in which to depose the attorneys which were questioned by the U.S. Trustee so that he may determine if the services which they rendered to their clients for the fees which they charged are comparable to the services which his firm rendered to the Debtors in the cases before the Court. There is nothing in either the oral argument of Debtors' Counsel or in the Motions filed on November 25, 1996, concerning the questions which were asked of the Debtors by the U.S. Trustee at the Section 341 hearing.

As stated above, at hearing on November 14, 1996, the Court denied the oral motion of Debtors' Counsel for an extension of 120 days in which to take depositions of the local attorneys who had been questioned by the U.S. Trustee. The Court finds it also appropriate to deny the written Motions filed on November 25, 1996, which essentially ask for the same relief sought by Debtors' Counsel in its oral presentation at hearing on November 14, 1996. The reasons for this denial are twofold:

1. The Court finds that Debtors' Counsel has been given adequate time and notice to conduct whatever investigations he felt necessary under the circumstances of these cases. Attorneys from Mr. Geraci's firm were present when the U.S. Trustee questioned the local attorneys about their fees in Chapter 7 cases and could have, at that time, made inquiries of the local attorneys themselves, but evidently chose not to do so. This fact, together with the ample time given to Debtors' Counsel to support the fees in the subject cases, leads the Court to the conclusion that Debtors' Counsel is not entitled to any extension of time pursuant to Rule 9006 of the Federal Rules of Bankruptcy Procedure in that no cause has been shown for such an extension.

2. Although the information elicited by the U.S. Trustee from the four local attorneys practicing in the Kankakee area is helpful to the Court, this information is not essential.[13] In order to determine the customary fee for a no-asset straight-forward Chapter 7 case such as those before the Court, this Court need only look into the records of the numerous Chapter 7 cases filed before it within the last year to see that practitioners who regularly practice before this Court routinely charge between $400 and $700 for cases which are essentially the same type of cases as those presently before the Court, with the sum of $500 being the normal fee for two practitioners who have filed several hundred cases like those before the Court this year. The Court further notes that it does not need the information

---

13. *See: In re Smith,* 48 B.R. 375 (Bankr.C.D.Ill. 1984), wherein the Court states that, although

not required, expert testimony may establish the customary fee within the locality.

provided by the Trustee to evaluate the service provided by the local attorneys from which the information was elicited. This Court is familiar with the quality of the service of those local attorneys who were questioned by the U.S. Trustee as it is familiar with the quality of the service of all of the practitioners who regularly file bankruptcy cases before it. The quality and extent of the services of other practitioners before this Court are not presently at issue, but rather the quality and extent of the services provided by Mr. Geraci's firm are what is at issue. The Court finds that Debtors' Counsel has been given ample time and opportunity to provide any and all information in support of his fees as he saw fit.

### V. Conclusions of Law

The parties are in agreement that the applicable law in the matters before the Court is found at 11 U.S.C. § 329, which states:

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

(2) the entity that made such payment.

Although it is clear that § 329 of the Bankruptcy Code is applicable in this instance, there is disagreement on how the Court should determine the reasonable value of the services of Debtors' Counsel. Some Courts have suggested, as has the U.S. Trustee, that the Court need only consider whether the fees of Debtors' Counsel are reasonable under the criteria established by § 329(b) of the Code. *See: In re Costello,* 150 B.R. 675 (Bankr.E.D.Ky.1992). While other Courts and Debtors' Counsel suggest that the Court must consider the criteria established under 11 U.S.C. § 330 in order to determine the reasonable value of the service of Debtors' Counsel. This Court finds, as the Court did in *In re Smith, supra,* at 378, that the criteria for fixing attorneys' fees as found in cases under 11 U.S.C. § 330 are applicable to the determination of reasonableness under § 329. The applicable factors to determine reasonable of attorneys' fees and expenses are set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), as applied to bankruptcy proceedings in *In re Smith, supra,* at 379. The factors set forth in *Johnson* are:

1. The time and labor required;

2. The novelty and difficulty of the questions;

3. The skill requisite to perform the legal service properly;

4. The preclusion of other employment by the attorney due to acceptance of the case;

5. Customary fee;

6. Whether the fee is fixed or contingent;

7. Time limitations imposed by the client or circumstances;

8. The amount involved and the results obtained;

9. The experience, reputation, and ability of the attorneys;

10. The undesirability of the case;

11. The nature and length of the professional relationship with the client; and,

12. Awards in similar cases.

The first *Johnson* factor is the time and labor required. As the Court set out above, all of the cases presently before the Court, with the exception of *In re Chellino,* are no-asset Chapter 7 cases having many similari-

ties. These cases are what could be best described as simple, straight-forward Chapter 7 bankruptcies which might, at most, require an attorney to make one court appearance in addition to his appearance at a Section 341 hearing. Mr. Geraci has stated that he rarely, if ever, files an asset case.[14] These simple, straight-forward Chapter 7 bankruptcies do not take a significant amount of time or labor. In this age of computerization, once information has been gathered to file a petition, the actual preparation of a petition takes very little time. In fact, the fee itemizations in these cases before the Court indicate that Debtors' Counsel spent an average of 36 minutes preparing the bankruptcy petitions. In fact, the fee itemizations indicate that the Debtors' Counsel charged almost as much time for the filing of the petition (30 minutes) as he did for the preparation. The Court finds this a bit odd in light of the fact that the petitions in question were mailed to the Court rather than having been filed in person. All in all, the Court finds that the amount of time and labor required to file a straight-forward no-asset Chapter 7 bankruptcy is not as extensive as Debtors' Counsel would have the Court believe.

The second *Johnson* factor is the novelty and difficulty of the questions involved in the case. In examining the twelve cases before the Court, the Court finds that there are no novel or difficult questions in any of these cases. As the Court has discussed above, these cases are quite similar in the fact that they appear to be very simple cases and that very little has been done in these cases beyond filing the bankruptcy petition, attending a Section 341 meeting and filing a few reaffirmations. As the Court noted above, none of these cases has any priority creditors with the exception of *Hoesman* in which the Court notes that there were $2,400 in priority taxes. None of the cases involved had motions to avoid liens filed in them, and only two of the cases had motions filed other than motions which were filed in regard to the fee matter presently before the Court. The Court further notes that Debtors' Counsel was only required to appear before this Court on one occasion other than the Section 341 hearing, and this, together with the other facts, leads the Court to easily conclude that the bankruptcy cases before it involve neither novel or difficult issues.

The third *Johnson* factor is the skill requisite to perform the legal service properly. As with factor Nos. 1 and 2, the Court finds that, under factor No. 3, no expert skill was required to perform the services in the twelve cases presently before the Court. These cases are routine, and the skill required to perform the legal services would be well within the grasp of the majority of competent practitioners who at least occasionally appear in bankruptcy proceedings.

The fourth factor in *Johnson* is the preclusion of other employment by the attorney due to acceptance of the case. There is no evidence that, by accepting any of the twelve cases presently before the Court, Debtors' Counsel was precluded from other employment. Mr. Geraci's firm has obviously filed many bankruptcy cases before both the Courts of the Northern District and the Central District of Illinois and has not shown that, by accepting a no-asset straight-forward Chapter 7 bankruptcy case, he is precluded from other employment. This factor might be relevant in complex litigation; however, it has no bearing in cases such as are before the Court where the issues are simple and the work routine.

The fifth *Johnson* factor, the customary fee, is perhaps the factor that has generated the most disagreement between the parties. Mr. Geraci argues that this factor should not be considered at all, while the U.S. Trustee argues that it is a significant factor in that Mr. Geraci is charging two to three times the fees that other regular bankruptcy practitioners are charging in the Central District of Illinois for the same type of cases as are involved here. The Court agrees with the U.S. Trustee that the customary fee charged by other attorneys in this District is a critical factor in this case and one which must be examined.

In support of her position, the attorney for the U.S. Trustee supplied information from

---

**14.** See Addendum to time itemization, page 7, paragraph 1.

four Kankakee area attorneys which indicate that their rates for filing straight-forward, simple Chapter 7 bankruptcy cases range from $300 to $700. The Court is not at all surprised by this information and has conducted its own review of its records. The Court has found that two bankruptcy practitioners who were responsible for filing hundreds of cases in the Central District of Illinois this year routinely charge the sum of $500 for bankruptcy cases that are of the same exact type as those presently before the Court. The Court has also found that there are attorneys who actually charge less than $300 for straight no-asset Chapter 7 cases; however, the Court finds that such fees are not the norm, but are below average, with the average being approximately $550.

The sixth factor to be considered under *Johnson* is whether the fee was fixed or contingent. This factor encourages attorneys to accept otherwise undesirable cases and permits them to recover a possible large fee if the case is successful. *In re Smith, supra,* at 381, citing *In re Yermakov,* 718 F.2d 1465 (9th Cir.1983), and *In re Warrior Drilling and Engineering Co., Inc.,* 9 B.R. 841 (Bankr.N.D.Ala.1981). Given that the cases presently before the Court were not undesirable cases and the fees in them were flat fees, the Court finds that there is no adjustment necessary, nor any further consideration necessary of the sixth *Johnson* factor.

The seventh *Johnson* factor is the time limitations imposed by the client or the circumstances of the case. Under this factor, it is recognized that certain bankruptcy cases involve emergency action, a great deal of attention, and numerous or complicated adversary proceedings. *See: In re Smith, supra,* at 381. As has been stated repeatedly in this Opinion, the cases before the Court are not difficult cases. They involve very little out of the ordinary, and there is no evidence that these cases involved any significant time limitations imposed by either the clients or the circumstances of the case. In fact, in these cases, the Court finds that there was a substantial amount of time between the initial contact between the Debtors and Debtors' Counsel and the actual filing of

the bankruptcy petitions, such that no argument can be made that any fast action was required on the part of Debtors' Counsel.

■■■■■ The eighth *Johnson* factor is the amount involved and the results obtained. The Courts assessing this factor consider the benefit accorded to the bankruptcy estate by the attorney services. *In re Smith, supra,* at 381. Matters such as the size and value of the estate are important in this factor. This was noted by the Court in *Smith* and has been noted by other Courts who have addressed the eight factor under *Johnson.* In reviewing the fee itemizations before it, the Court finds that apparently Mr. Geraci believes that attorneys' fees should increase based upon the amount of debt there is to be discharged from one case to another. This Court does not agree with this position and finds that, even though the number and amount of debts can have an affect on the amount of work done in a given case, in the cases presently before the Court, as in most straight-forward, simple Chapter 7 cases, the actual amount and number of debts has only a negligible bearing upon the amount of work that is required. All of the cases presently before the Court are relatively simple, no-asset cases, and the Court can see no basis upon which to increase fees based upon the amount of debt being discharged. The eighth factor also considers the results obtained in a given case. As the Court has set out above, Mr. Geraci argues that his firm provides top-notch service. However, as the Court has noted, the fee itemizations and the Addendum to those fee itemizations do not support a finding that superior, expert service was provided to the Debtors in the cases presently before the Court. No outstanding results were achieved in these cases, and the Court finds no extraordinary benefits for either the Debtors or their creditors. The cases presently before the Court would have seen the same result had the services been performed by any competent counsel in a competent manner. Mr. Geraci does not want to be compared to other counsel as such a comparison shows that he is charging an excessive fee while obtaining a result no better than other competent practitioners who regularly appear before this Court.

■ The ninth *Johnson* factor is the experience, reputation, and ability of the attorneys. The Courts recognize that an experienced attorney normally is entitled to a premium fee, but longevity must be secondary to the skill exhibited by the attorney. *See: In re Johnson, supra,* at 719. Mr. Geraci holds himself out as being "the unquestioned foremost consumer bankruptcy practitioner in the country;" however, the attorneys whose names appear most on the fee itemizations in question and the attorneys who have appeared before this Court are relatively inexperienced.[15] Neither the fee itemizations or the experience of this Court indicate that Mr. Geraci himself has spent any significant amount of time on the cases at hand. The work product of Debtors' Counsel is not extraordinary. It is not outstanding. It is not up to a level that this Court sees from the majority of practitioners who regularly appear before it. The quality of the work product of Debtors' Counsel is clearly exemplified in his written and oral presentations regarding the issue now before the Court. The pleadings of Debtors' Counsel in this matter are not well written and they are not germane. Both the written and oral work of Debtors' Counsel indicate that he and his firm are either unwilling or unable to focus on the issue before the Court.

The tenth *Johnson* factor concerns the "undesirability" of the case. The cases at bar are not undesirable cases. They are routine cases, and they are cases which Mr. Geraci seeks to file. He has indicated that he does not file asset cases, and, with the exception of *Chellino,* the cases at hand are no-asset cases that involve no complex issues.

The eleventh *Johnson* factor concerns the nature and length of professional relationship with the client. This factor is not a significant factor, nor is it relevant to the cases at bar. There is no evidence that Mr. Geraci's law firm has had any longstanding relationship with any of the clients that are the Debtors in these proceedings, nor would this factor carry any great weight if there was a showing that there was some prior relationship preceding the filing of the instant bankruptcy matters.

The twelfth *Johnson* factor, "awards in similar cases," is basically the same as factor No. 5, "customary fee." In analyzing this factor, the Court notes that Mr. Geraci has not argued that his fees are reasonable under any of the *Johnson* factors. Instead, his main argument is that his fees are reasonable because the "market" should control. As a basis for this argument, Mr. Geraci cites an Opinion by Judge Ginsberg, from the Northern District of Illinois. entered on May 6, 1996, in the cases of Rudolph and Marion Horvath, No. 87-B-16757, and Roger Battle, Jr., No. 88-B-11055, in which Judge Ginsberg approved Mr. Geraci's fee application in the amount of $975 in *Horvath* and $1,256 in *Battle.* As a basis for this Opinion, the Court stated:

The Court no longer believes that a written opinion is necessary. Since 1990, courts seem to have had little difficulty determining the reasonableness of fees for attorneys who represent debtors in *Chapter 13 cases.* 11 U.S.C. § 330, as amended by the Bankruptcy Reform Act of 1994, provides standards which are applicable to attorneys who represent debtors in cases filed under *Chapter 13* of the Bankruptcy Code. These factors, in combination with the apparent ability of the market to determine the reasonableness of fees, vitiate the need for a written opinion. For these reasons, the Court strikes the part of the August 6, 1990 oral ruling in which the Court stated that a written opinion was to follow. These cases can now be closed. (emphasis added).

As for Judge Ginsberg's Opinion of May 6, 1996, the Court finds that it is of little precedential value. This Opinion related to Chapter 13 bankruptcy cases, and was issued in a one-page letter form nearly six years after the hearings had taken place.

Mr. Geraci has also submitted a "expert report" of one Henry N. Butler, J.D., Ph.D., entitled "Economic Impact of Maximum Fee

---

**15.** Attorneys who have appeared before the Court on these fee matters and who have supplied much of the written materials in these matters each have less than five years of legal experience.

Restrictions on the Market for Bankruptcy Legal Services." At paragraph 1 of this study, Mr. Butler indicates:

> I have been retained by the *Law Offices of Peter Frances Geraci, J.D.* to provide an economic analysis of the impact of a requirement that a lawyer's fee for handling a client's bankruptcy case be limited to the lowest rate charged by lawyers representing other bankrupt debtors before a particular court.

This is not the issue presently before the Court. The issue before this Court is whether the fees charged by Debtors' Counsel in the twelve cases captioned above are reasonable. This Court has no intention of limiting the fees of Mr. Geraci to the lowest rate charged by lawyers representing bankrupt debtors in this District because that rate is well below the average and the work may be performed in a below-average manner. In reviewing the conclusion of the economic study supplied by Mr. Geraci, it appears that the bottom line is that better lawyers should be allowed to charge higher fees. In this regard, as the Court has already stated, it must find that the attorneys that have appeared before it from Mr. Geraci's firm are not better lawyers. In fact, the attorneys that have appeared on behalf of Mr. Geraci's firm are not as experienced or as competent as the majority of the practitioners who regularly appear before this Court. The Court can make no conclusions about Mr. Geraci's legal ability other than to review the written materials which he has supplied in conjunction with the issue before this Court. In so doing, the Court finds that Mr. Geraci has not exemplified himself as an outstanding practitioner, as he claims to be.

In addition to its opportunity to review the written and oral work of Debtors' Counsel, the Court has also had an opportunity to review many of the bankruptcy cases filed by Debtors' Counsel. In this regard, the Court finds that many of the bankruptcy petitions filed by Debtors'. Counsel are not as thorough and as complete as most of the bankruptcy practitioners who regularly file petitions with this Court. Many cases have been sent to this Court without filing fees, and, after a request has been made for those filing fees, the fees do finally appear, usually in the form of money orders sent directly from the debtors. The Court has also noted that many filings are made where the creditor matrix is missing and a request has to be made for that matrix. In fact, in a recent case filed on October 10, 1996, *In re Isaacs,* No. 96–91799, the case was filed without a Summary of Schedules and a Declaration Concerning Statement of Affairs. An Order had to be sent indicating that that case would be dismissed if those items were not supplied. In another case, *In re Morrical,* No. 96–91902, the case was filed missing a creditor matrix and other items. An Order was entered on October 22, 1996, giving Mr. Geraci's firm eight days to file the missing information. The Court held up on dismissing the case until November 15, 1996, when an Order was finally entered dismissing the case because the missing documents had not been supplied. Mr. Geraci's fee for representing the Morricals was disclosed as $1,395. On December 23, 1996, Mrs. Morrical called the Clerk about the status of her case and was very surprised that her case had been dismissed and closed. This is not an example of competent service. All in all, the Court finds that the argument by the Debtors' Counsel that the "market" should control has failed to substantiate the fees charged in the instant cases. The economic study presented to the Court is flawed in that it is does not deal with the issue that is before the Court, and its conclusion that better lawyers should be paid higher fees does not support the fees requested by Mr. Geraci, because there has been no showing that the attorneys in Mr. Geraci's firm are, in fact, better than most of the practitioners that regularly appear before this Court.

The Court notes in applying a pure "Lodestar Analysis" to these cases it must conclude that the fees charged have not been substantiated as required by the case law. As stated above, many of the entries in the fee itemizations are not compensable due to the fact that they do not sufficiently describe the service for which time is charged. Many of the entries are lumped together in a manner such that the Court cannot separate them out to determine whether time spent on each task was reasonable. Finally, the Court

notes that it will not compensate Debtors' Counsel for the $75 per hour fee charged for "clerk" time in that said charges are not supported by any evidence that the tasks so performed required the services of a paralegal or were actually performed by a paralegal. This time will be considered by the Court as an inappropriate billing of overhead expense. *See: In re Lindberg Products, Inc.*, 50 B.R. 220 (Bankr.N.D.Ill.1985); *In re Stoecker*, 114 B.R. 965 (Bankr.N.D.Ill.1990); and *In re Convent Guardian Corp.*, 103 B.R. 937 (Bankr.N.D.Ill.1989).

## VI. Conclusion

■ Mr. Geraci claims that he is "the unquestioned foremost consumer bankruptcy practitioner in the country," and that his "law firm is chosen by more debtors than any other law firm in the world, to represent them in consumer bankruptcy cases." By this boast, Mr. Geraci attempts to cut a wide swath in this field of bankruptcy practice, but the modest to average legal performance of Mr. Geraci and of other lawyers in his firm combined with the relatively simple no-asset cases presently before the Court has not earned him the right to harvest the fees he seeks. Having reviewed all of the evidence and information before it, the Court concludes that an appropriate fee in each of the twelve cases at bar is the sum of $800. For administrative convenience and review in the future and at present, this Court chooses this sum even though it is above the average of $550. To the extent that Mr. Geraci has received fees in excess of $800 in each of the cases presently before the Court, he will be ordered to disgorge those sums to the respective debtors in the form of a cashier's check with copies being sent to the Court and to the U.S. Trustee as proof of the disgorgement. This holding will be applicable not only to the twelve cases presently before the Court, but will be applicable to all pending cases filed by Mr. Geraci's law firm and future cases filed by Mr. Geraci in that the Court will allow him the option of either filing a detailed fee application where he seeks fees in excess of $800, or of accepting the sum of $800 without the requirement of filing any such fee application.

## ORDER

For the reasons set forth in an Opinion entered on the 27 day of December 1996;

IT IS HEREBY ORDERED that:

A. Motion for a Rule to Show Cause why the United States Trustee, M. Scott Michel, and Sabrina M. Petesch, attorney for U.S. Trustee should not be held in contempt of Court for attempting to fix prices for consumer bankruptcy, and foster unfair competition, and for Rule 11 Sanctions, filed as part of the Debtor's Attorney's Response to Motion of United States Trustee's Motion to Show Cause, on September 23 and September 25, 1996, is *DENIED;*

B. Motion to Strike Attorney Affidavits Contained in Memorandum in Support of Motion to Show Cause & Reply to Response filed by Debtor's Counsel on November 25, 1996, is *DENIED;*

C. Motion to Enlarge Time in Which to Supplement Record Pursuant to Federal Bankruptcy Rule 9006, filed by Debtor's Counsel on November 25, 1996, is *DENIED;*

D. Motion to Review Compensation of Debtor's Attorney Pursuant to Section 329 filed by the Case Trustee in *In re Chellino,* No. 96–90941, is *ALLOWED* to the extent that compensation for Debtor's Counsel in *Chellino* shall be limited to the sum of $800, with Debtor's Counsel being ordered to return all sums in excess of $800 to the Debtor within ten days of this Order in the form of a cashier's check with copies being sent to the U.S. Trustee and to the Court;

E. The Motions to Show Cause filed by the U.S. Trustee on September 5, 1996, in each of the above additional eleven cases are *ALLOWED* to the extent that the Debtors' Counsel will be limited to a fee of $800 on each case with all sums paid in excess of $800 to be returned to the Debtors within ten days of the entry of this Order in the form of cashier's checks with copies being sent to the

U.S. Trustee and to the Court as proof of payment; and,

F. Debtors' Counsel is further ordered to file written fee itemizations in all cases presently pending before the Court with the exception of those captioned above to the extent that he seeks fees in excess of $800 in those cases.